THIS DISPOSITION IS
CITABLE AS PRECEDENT OF
THE TTAB

Hearing:                                        Mailed:
September 14, 2005                               June 5, 2006
                                                JTW


# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## Trademark Trial and Appeal Board

_____

American Flange & Manufacturing Co., Inc.
v.
Rieke Corporation

_____

Opposition No. 91153479
to Application Serial No. 75869942
filed on 12/13/1999

and

Opposition No. 91154680
to Application Serial No. 75869343
filed on 12/13/1999

_____

Corey M. Amron, William H. Oldach III and Peter A. Lusenhop
of Vorys, Sater, Seymour & Pease LLP for American Flange &
Manufacturing Co., Inc.

James A. Dimitrijevs and David B. Cupar of McDonald Hopkins
Co., LPA for Rieke Corporation.

_____

Before Holtzman, Zervas and Walsh, Administrative Trademark
Judges.

Opinion by Walsh, Administrative Trademark Judge:

In this consolidated proceeding, American Flange &

Manufacturing Co., Inc. ("Opposer") has opposed two

applications by Rieke Corporation ("Applicant") to register

two related marks consisting of the product design for a

plug or cap which is an integral part of a closure system for 55-gallon steel drums. Opposer asserts that the marks in both applications should not be registered both because the product design claimed is functional[1] and because applicant has failed to show that the marks have acquired distinctiveness. Opposer also asserts that applicant committed fraud in securing the examining attorney's approval of the applications for publication.

Applicant describes its mark in Application Ser. No. 75869942 ("the 942 application"), shown below, as follows: "The mark consists of the configuration of a closure to be used on a drum container. The closure features a butterfly-shaped grip for turning the closure."



---

[1] The use of the term "functional" in this opinion means "de jure functional" as discussed in cases, such as, In re Morton-Norwich Prods., Inc., 671 F.2d 1332, 213 USPQ 9 (CCPA 1982). As the Board has stated, ". . . if the design of a product is so utilitarian as to constitute a superior design which others in the field need to be able to copy in order to compete effectively, it is de jure functional and is precluded from registration as a matter of public policy." In re Caterpillar Inc., 43 USPQ2d 1335, 1338 (TTAB 1997)(citations omitted).

The goods are identified as "metal closure fitting for drum containers" in International Class 6. Applicant has claimed both first use of the mark anywhere and in commerce in 1940. Applicant submitted a claim of acquired distinctiveness under Section 2(f) of the Act, 15 U.S.C. § 1052(f).

Applicant describes its mark in Application Ser. No. 75869343 ("the 343 application"), shown below, as follows: "The mark consists of the configuration of a closure to be used on a drum container. The closure features a substantially hexagonal base and a butterfly-shaped handle/grip for turning the closure. The dotted lines are not part of the mark but merely indicate the position of the mark relative to the overall product."



The goods are identified as "metal closure fitting for drum containers" in International Class 6. Applicant has claimed both first use of the mark anywhere and in commerce in 1940. Applicant submitted a claim of acquired distinctiveness under Section 2(f) of the Act, 15 U.S.C. § 1052(f).

3

## The Record

The record in these proceedings is voluminous. Opposer sets forth the contents of the record in its main brief at pages 2-4. In its brief at page 5, applicant states, "Applicant accepts the Description of the Record set forth in Opposer's Main Brief." In the absence of any dispute and in the interest of brevity, we will not repeat the listing opposer provided. The record includes numerous documents submitted under notices of reliance and both testimonial depositions and discovery depositions, submitted in evidence by stipulation of the parties, with numerous exhibits, including physical exhibits of relevant products. Among the witnesses are several third-party witnesses and a survey expert for applicant.

Before proceeding we must address one issue regarding the record. Both opposer and applicant have submitted the testimony of many of their own witnesses entirely under seal. In each instance neither party has made any attempt to delineate the truly confidential portions by redaction. However, the parties cannot shield from the public information that is not appropriately confidential. See Trademark Rule 2.27(d) and (e). It is apparent that most of the testimony and exhibits submitted under seal are not confidential. Therefore, within thirty days of the mailing date of this decision, the parties are ordered to resubmit a

redacted copy of all testimony and exhibits submitted under seal with only those portions which truly need to be kept under seal redacted. The redacted copy will be placed in the public record. If either party fails to make this submission as to any sealed deposition, the entire deposition and exhibits will become part of the public record.

### The Mark

Although each of the two applications at issue here includes a different description of the mark and a different drawing of the mark, the marks are identical for purposes of the issues before us. That is, the mark consists of a product design for a plug or cap, specifically a plug with a "substantially hexagonal base" and a "butterfly-shaped grip."

The plug or cap is a component part of a closure assembly for 55-gallon industrial steel drums. The other principal component of the closure assembly relevant here is a flange which is installed in the drum head or lid to create a circular opening to enable one to fill or empty the drum. The plug screws into the flange to seal the drum.

In the 942 application, the drawing shows the plug only, without a flange. The threaded lower portion of the plug is shown in dotted lines. Although the description of the mark does not mention the dotted lines, we conclude that

the dotted lines indicate that the subject matter so depicted is not claimed as a feature of the mark.  37 C.F.R. § 2.52(b)(4).  See also In re Controls Corp. of America, 46 USPQ2d 1308, 1312 (TTAB 1998);  In re Famous Foods, Inc., 217 USPQ 177, 177 (TTAB 1983).  The description of the mark states in relevant part, "The closure features a butterfly-shaped grip for turning the closure."  The description does not refer to the hexagonal base.  Nor does the description indicate that the butterfly-shaped grip is the only subject matter claimed as a feature of the mark.  Therefore, in the absence of a depiction of the hexagonal base in dotted lines to show that it is not being claimed, or language excluding the hexagonal base from the subject matter claimed, we conclude that the mark in the 942 application includes both the hexagonal base and the butterfly-shaped grip.

In the 343 application, the drawing shows the plug or cap inserted into the flange.  The flange is shown in dotted lines to indicate that it is not claimed as a feature of the mark.  In this case the description of the mark, in relevant part, states, "The dotted lines are not part of the mark but merely indicate the position of the mark relative to the overall product."  The description of the mark states further, "The closure features a substantially hexagonal base and a butterfly-shaped handle/grip for turning the closure."  This verbal description and the drawing lead us

6

to conclude that the mark in the 343 application also includes both the hexagonal base and the butterfly-shaped grip.  In re Controls Corp. of America, 46 USPQ2d at 1312.

Accordingly, any reference to "applicant's mark" in this opinion refers to the mark consisting of the hexagonal base[2] and the butterfly-shaped grip of applicant's plug. This is the mark covered by both applications at issue here. The characterization of the mark is important for purposes of our determination as to whether or not the mark is functional.  In view of the mark claimed in these applications, if either the hexagonal base or the butterfly-shaped grip is functional, then both applications fail.[3]

### The Claims

In the notices of opposition in each of the two consolidated proceedings opposer asserts the same three grounds for opposition, namely:  (1) that "Applicant's Proposed Mark does not serve as a trademark, but rather is a functional configuration," as alleged in Count I of both

---

[2] Applicant states in its brief, "Each of the Subject Marks consists of a substantially hexagonal base (also called a plug head or lip) that incorporates six flat sides of roughly equal length and six shorter sides of roughly equal length that are slightly rounded."  Any suggestion that the applications cover a mark which includes a twelve-sided base or some variation on a twelve-sided base is inconsistent with applicant's drawings and descriptions in the applications and inconsistent with the actual product and applicant's overall argument.

[3] Opposer has also argued that we should require a new drawing if we conclude that one feature is functional but that the overall mark is registrable.  In view of our conclusions regarding the mark, we need not consider this request.

notices of opposition; (2) that " . . . the Proposed Mark has not acquired secondary meaning and Applicant has not shown that the Proposed Mark is recognized by consumers as an indicator of source," as alleged in Count II of both notices of opposition; and (3) that applicant committed fraud in that "Applicant . . . has made a number of misrepresentations and/or omissions of facts" which were "material" and which applicant "made with the intent to deceive the Trademark Office into approving the Proposed Mark for Publication," as alleged in Count III of both notices of opposition.

In its answers, applicant has denied the salient allegations in both notices of opposition. Applicant also asserts a number of purported affirmative defenses. We do not regard the "Affirmative Defenses" asserted in paragraphs numbered 1 through 5 in both answers as affirmative defenses, but rather, attempts to refute the merits of the oppositions directly, and we will address them as such. In numbered paragraphs 6 & 7 under "Affirmative Defenses," applicant asserts that, "6. Opposer has failed to state a claim upon which relief may be granted," and that "7. The relief Opposer seeks is barred by the doctrine of unclean hands and estoppel." Applicant did not argue these affirmative defenses in its brief, and we have not considered them in our determination of these proceedings.

## Standing

Standing is not an issue in this case. Opposer has alleged and shown that it is a direct competitor of applicant in the sale of closure systems, the goods which are also the subject matter of the marks applicant claims here. See generally Jewelers Vigilance Committee Inc. v. Ullenberg Corp., 823 F.2d 490, 2 USPQ2d 2021, 2023 (Fed. Cir. 1987).

## Drum Closure Systems

Opposer and applicant are the two leading U.S. producers of drum closures, including the type at issue here, a 2-in. closure system for a 55-gallon steel drum.[4] The 2-in. measure refers to the diameter of the plug or cap. The closure system simply provides for an opening in the head or lid of the steel drum to facilitate filling, sealing, opening and emptying the drum. The principal components of applicant's closure system are a 2-in. plug and a flange into which the plug is inserted. Applicant's mark at issue here is the product design for its plug, specifically, the hexagonal base and the butterfly-shaped insert or grip of applicant's plug. The grip is an insert in the internal "cup" of the conically shaped plug. Although applicant seeks to register the product design of

---

[4] Manufacturers of steel drums will usually install both a ¾-in. closure and a 2-in. closure on the head of a drum. Applicant only uses the mark at issue here with its 2-in. closure system.

the plug only, the plug is an integral part of the overall drum closure system or assembly. The design, installation and use of the entire closure system is also integral to the determination of the issues here.

The closure system is used with 55-gallon steel drums. The drums are used to store and transport both liquids and solids, such as chemicals and similar materials, generally in an industrial setting. The primary customers for the closure system are drum makers and drum reconditioners. Drum reconditioners take used steel drums and recondition them for reuse. Drum fillers are also regarded as customers for the closure system. Drum fillers, such as chemical companies, are the primary users of 55-gallon steel drums. Drum fillers typically specify a particular closure system in ordering steel drums. Therefore, a manufacturer or seller of closure systems will market its closure systems to drum fillers in an effort to influence drum fillers to specify its closure system when ordering drums from either a manufacturer or reconditioner of drums. The customers of the drum filler, that is, the purchasers of the contents the filler places into the drums, are the end users or "consumers" of the drums and the associated closure system.

Applicant's particular closure system first requires the installation of applicant's flange with its serrated outer collar into an embossment in an opening in the head of

10

the drum. Applicant provides machinery to perform this installation as well as technical support to aid in the use of its closure system. The flange is driven upward into the embossment. The penetration of the serrated edges of the collar of the flange into the embossment secures the flange and provides torque resistance when a plug is screwed into the flange. That is, the flange remains in place when one screws the lower conical, cup-like portion of the plug into the receiving conical portion of the flange. The inner side of the conical portion of the flange and the outer side of the cup-like portion of the plug are threaded to permit tightening. Most uses of the drums require significant torque to provide a tight seal when a drum is filled. Applicant's plug includes a lip or hexagonal base, which extends out around the top of the conical cup of the plug. The plug also includes a gasket which rests beneath the base or lip of the plug.

When applicant's plug is inserted into the flange and tightened, the base or lip compresses the gasket against the lid of the drum surrounding the flange opening and seals the closure.[5] The gasket is outside the drum; it is the only gasket needed with this system to block any path through

---

[5] Applicant's and opposer's system may also include a seal which fits over the plug and flange for security purposes. This outer seal serves to demonstrate that the drum, once closed, has not been opened or tampered with while in transit or storage, but it is not needed to close the drum tightly.

11

which the contents of the drum might escape. This feature is important in the reconditioning process because the drum can be cleaned during reconditioning without damaging the gasket and compromising the integrity of the closure system.

In the case of applicant's system the receiving conical portion of the flange extends below the surface of the drum head. This feature of applicant's system can cause difficulty in emptying a drum completely. Applicant punches small holes in the conical portion of the flange which mitigates this difficulty to some extent but not entirely.

Applicant's system also includes a "butterfly-shaped grip" or insert in the cup of the plug. In both applications applicant indicates that the purpose of butterfly-shaped grip is to "turn the closure."

For purposes of our determination, it is also necessary to consider opposer's closure system. For approximately the past 60 years applicant's and opposer's closure systems have been the principal systems employed in the industry in the United States. Opposer's closure system serves the same general purpose as applicant's, but it involves a different design.

Opposer's system also has two principal components, the flange and the plug. Opposer, like applicant, provides machinery and technical support for installation and use of its system. Opposer's flange has an octagonal outer edge.

12

Opposer's flange is also inserted into an embossment in the drum head or lid, in this case an embossment which is also octagonal. In opposer's system, it is the octagonal shape which holds the flange in place and which provides the necessary torque resistance when tightening the plug or cap in the flange. Opposer's flange includes a gasket which is pressed between the flange and the lid inside the drum when the flange is installed. This gasket blocks a potential pathway for leakage from the drum when filled. The flange includes a conical opening which is threaded on the inside to receive the plug.

Opposer's plug includes a cup with a threaded outer side to match the threaded inner side of the flange. Opposer's plug has a minimal lip which overlays and presses a small gasket against the flange. The lip of opposer's plug does not extend beyond the flange to the drum head surface when inserted. The overall design of opposer's system requires two gaskets to block potential leakage pathways, the gasket between the flange and the inside of the drum head and the gasket between the plug and the flange.

The requirement for a gasket between the flange and the drum head complicates cleaning during reconditioning because the gasket can be destroyed during certain types of cleaning, particularly when burning is used to remove any

13

residue left in the drum.  The destruction of the flange gasket necessitates a "workaround" to restore the integrity of the closure system of the reconditioned drum.

In opposer's system the base of its flange is flush with the head of the drum, when installed, and the conical portion of the flange extends upward.  Consequently, there is no impediment to emptying the drum fully with opposer's system.

Opposer's plug includes an insert consisting of a metal piece anchored to the bottom of the plug cup with the ends folded over to form two loops which can be gripped with a plug wrench or by hand.

Both applicant and opposer, and others in the field, provide special wrenches, called "plug wrenches," to tighten their plugs fully.  The plug wrenches are designed to grip the inserts in the cup of the plugs.  When it is not necessary to tighten a plug fully, such as when the drum is being stored or shipped empty, a plug may be inserted and partially tightened by hand.  A plug may also be inserted and partially tightened by hand prior to using either a wrench or pneumatic tool to tighten a plug fully.

## Functionality

Trade dress features, including product designs, may be registered as trademarks subject to certain conditions.[6] As the Supreme Court has noted, "It is well established that trade dress can be protected under federal law. The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods. In these respects, protection for trade dress exists to protect competition." TrafFix Devices Inc. v. Marketing Displays Inc., 532 U.S. 23, 58 USPQ2d 1001, 1004 (2001). However, the Court states further, "And in Wal-Mart, supra, we were careful to caution against misuse or over-extension of trade dress. We noted that product design almost invariably serves purposes other than source identification." Id., citing, Wal-Mart Stores Inc. v. Samara Bros. Inc., 529 U.S. 205, 54 USPQ2d 1065 (2000).

---

[6] The courts and the public have used the terms "trade dress," "product design," and similar terms, often loosely and interchangeably, to refer to product features as to which trademark rights are claimed.

Primary among the "other requisites" to qualify for trademark protection is the "functionality" test.[7] This requirement guards against "misuse" or "over-extension" of trade dress protection. That is, a product design which is functional cannot be registered. Valu Engineering Inc. v. Rexnord Corp., 278 F.3d 1268, 61 USPQ2d 1422, 1425 (Fed. Cir. 2002). As the TrafFix Court observed:

> Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 9 USPQ2d 1847 (1989). Allowing competitors to copy will have salutary effects in many instances. "Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology." Id.

TrafFix, 58 USPQ2d at 1005.

Over the years, the Supreme Court has used a number of formulations to articulate the functionality doctrine. For example, in Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982), the Court stated, "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." In

---

[7] Secondly, applicant must show that the product design has acquired distinctiveness. Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 34 USPQ2d 1161, 1163 (1995).

Qualitex the Court stated further, "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitex, 34 USPQ2d at 1163-64, citing, Inwood, 214 USPQ at 4 n.10.

In Valu Engineering, the Court of Appeals for the Federal Circuit confirmed that its long-standing test for determining whether a particular product design is functional remained viable after TrafFix, noting, "We do not understand the Supreme Court's decision in TrafFix to have altered the Morton-Norwich analysis." Valu Engineering, 61 USPQ2d at 1427. The Federal Circuit and its predecessor court, the Court of Customs and Patent Appeals, have employed the Morton-Norwich analysis or test for nearly twenty-five years.

Morton-Norwich identifies the following factors to be considered in determining whether a particular design is functional: "(1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in

17

a comparatively simple or cheap method of manufacturing the product." Morton-Norwich, 213 USPQ at 15-16.

In TrafFix, the Supreme Court addressed and clarified the proper weight to be accorded a utility patent in that analysis, as well as the role of alternative designs. TrafFix Devices Inc. v. Marketing Displays Inc., 58 USPQ2d at 1005. The Supreme Court notes, "A prior patent, we conclude, has vital significance in resolving the trade dress claim. A utility patent is strong evidence that the features claimed therein are functional. . . Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." Id. As to the role of alternative designs, the Federal Circuit observes in Valu Engineering:

> Nothing in TrafFix suggests that consideration of alternative designs is not properly a part of the overall mix, and we do not read the Court's observations in TrafFix as rendering the availability of alternative designs irrelevant. Rather, we conclude that the Court merely noted that once a product feature is found functional based on other considerations, there is no need to consider the availability of alternative designs because the feature cannot be given trade dress protection merely because there are alternative designs available. But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.

18

Valu Engineering, 61 USPQ2d at 1428 (footnote omitted).

In Valu Engineering, the Federal Circuit also confirmed that applicant bears the ultimate burden on the issue of functionality: "Where, as here, the opposer in a trademark opposition has made a prima facie showing of functionality, the burden shifts to the applicant to show nonfunctionality. (citations omitted) . . . The appropriateness of shifting the burden in a trademark opposition proceeding is supported by the recent amendments to Section 43(a) of the Lanham Act, which shifts the burden of proving nonfunctionality of unregistered trade dress to applicant-plaintiff in civil actions for trade dress infringement, even without a prima facie showing by the alleged infringer. 15 U.S.C. § 125(a)(3)(2000)(footnote omitted)." Valu Engineering, 61 USPQ2d at 1429.

Thus, in this case we must analyze each of the features claimed by applicant, the hexagonal base and the butterfly-shaped grip, according to the four Morton-Norwich factors and determine whether opposer has established a prima facie case of functionality, and if so, whether applicant has rebutted that showing. If after that analysis we find either feature functional applicant's mark cannot be registered. In re R. M. Smith, Inc., 734 F.2d 1482, 222 USPQ 1, 2 (Fed. Cir. 1984); Petersen Mfg. Co. v. Central

19

Purchasing, Inc., 740 F.2d 1541, 222 USPQ 562, 569 (Fed. Cir. 1984).

### The Hexagonal Base

First, we will analyze opposer's and applicant's arguments and evidence related to each of the Morton-Norwich factors with respect to the hexagonal base or lip of applicant's plug.

*Expired Patents* – Opposer asserts that both features of applicant's mark are covered by expired U.S. Patent No. 4,124,140.  Specifically, opposer asserts that the hexagonal base or lip is functional as demonstrated by the following statement in the patent:  "The annular circular lip preferably has a *hexagonal periphery* to accommodate a standard wrench which may be used to tighten the cap in the sleeve."  (Emphasis provided by opposer.)  Opposer also asserts that claim 12 of the patent specifically claims the hexagonal periphery as a feature.  Claim 12 states, "The closure of claim 1 in which the annular circular lip has a hexagonal periphery."

Applicant first argues that the patent is not relevant because Allen-Stevens Corporation[8] applied for the patent in 1978 long after the first use of the features applicant claims as its mark.  Applicant argues further, "The date of

---

[8] Below we will discuss Allen-Stevens' sale of a product incorporating applicant's design and applicant's relationship with Allen-Stevens.

first use of the Subject Marks and the filing date of the '140 patent show that the '140 patent is *not* directed to a closure plug like the Subject Marks, otherwise the '140 patent would not have been allowed for lack of novelty during prosecution." And applicant argues, "The '140 patent has nothing to do with a closure plug having a hexagonal base with rounded corners and a butterfly-shaped grip, but rather is directed to a sealing means that includes a flexible, resilient (i.e., plastic or rubber) annular (i.e., circular) gasket 28 and a cylindrical ring 30."

In addition, applicant argues, "Opposer also incorrectly argues that claim 12, which recites that the 'the annular circular lip has a hexagonal periphery' . . . shows the functionality of the Subject Marks. . . Opposer's argument ignores longstanding precedent that dissecting a design into individual features and analyzing the utility of each feature does not establish functionality." (Citation omitted.) Applicant adds, "Opposer's argument concerning claim 12 is also incorrect simply because the Subject Marks do not include an 'an annular circular lip.'"

To remove any doubt we first confirm that the fact that the Allen-Stevens Corporation, and not applicant, owned the patent in question is not relevant. In re Virshup, 42 USPQ2d 1403, 1405 (TTAB 1997). Any expired patent is

21

potentially relevant if it covers the feature at issue, regardless of the owner.

Applicant may be correct in noting that the hexagonal base was in use long prior to the patent application and that the patent was "directed to" a sealing means rather than the hexagonal base. Nonetheless, the patent language clearly refers to the functional advantage of the hexagonal base, that is, "to accommodate a standard wrench." Thus the terms of the patent indicate that the feature is a functional one and not an "ornamental, incidental, or arbitrary aspect of the device." As Morton-Norwich states, the patent here is "a utility patent disclosing the utilitarian advantages of the design," even if it is not primarily directed at this feature. Morton-Norwich, 213 USPQ at 15-16.

As to applicant's dissection argument, opposer properly focuses on one of the two elements applicant claims in its mark, as we must. We must analyze each element to determine whether applicant's mark is functional overall. It is entirely proper and necessary for us to consider whether the hexagonal base or lip is functional to determine whether applicant's mark, as a whole, is registrable. In this case, applicant's mark consists of two principal features, each of which is significant in its own right. In re R. M. Smith, Inc., 222 USPQ at 2.

22

As to applicant's arguments regarding the "annular lip" language in claim 12 of the patent, applicant's argument is largely semantic. It is evident that the claim refers to the hexagonal base or lip applicant claims in its mark. The "annular" reference merely indicates that the lip, as well as the gasket, forms a ring around the cup portion of the plug or cap. The patent depicts precisely the base or lip shape applicant describes in the application, "a substantially hexagonal base" and the shape applicant depicts in its drawing. Again, we reject any suggestion that applicant's mark is a twelve-sided base with rounded edges or anything other than what applicant described and depicted. We also find applicant's description and drawing to be consistent with its actual product in evidence in these proceedings.

Accordingly, we conclude that expired U.S. Patent No. 4,124,140 is strong evidence that the hexagonal base or lip of applicant's plug is functional.

*Advertising Materials* – Opposer asserts that applicant has touted the advantages of the hexagonal base or lip. Opposer points to examples of applicant's product literature dating from the World War II era to the present for this purpose. A 1991 brochure states, "the hexagonal shoulder provides ease of opening when no conventional wrenches are available." This statement appears multiple times in this

23

and other similar materials, as well as on applicant's website.  Another of applicant's brochures notes, "Hexagonal shoulder makes them easy to open without wrenches."

With regard to its literature, applicant states, "The language of Applicant's marketing materials that talks about ease of opening when 'conventional wrenches' are not available may be seen as a reference to turning the plug by hand rather than engaging the insert with a drum wrench." Applicant also goes to some lengths to argue that the language should not be read to suggest that a standard wrench may be used when a specialized plug wrench is not available.  Applicant argues that standard wrenches would not open wide enough to grip the hexagonal exterior of the plug, a point we will address further below.

As to the literature, there is no doubt that applicant's literature in unambiguous language touts the functional advantages of the hexagonal shape of the lip or base of its plug.  The literature primarily touts the fact that the shape permits use of a standard wrench, but also the further benefit that it facilitates turning by hand. The suggestion that the only advantage touted here is relative to turning by hand is contrary to logic and in conflict with applicant's own statements.  Throughout its testimony applicant has emphasized that a wrench is required to tighten a plug fully; applicant's World-War-II-era

literature actually shows a character using a standard wrench to tighten its plug by gripping the hexagonal base. Therefore, we conclude that this factor indicates that the hexagonal base is functional.

*Alternative Designs* – Even though we find strong evidence under the "patent" factor that a patent discloses the utilitarian advantages of the hexagonal lip or base, we will consider the availability of alternative designs. See Valu Engineering, 61 USPQ2d at 1427.

Opposer offers numerous arguments which more or less relate to the "alternative-design" factor.

Opposer argues that the design of applicant's plug, as a component of its overall closure system, offers distinct advantages. First opposer argues that the overall design of applicant's closure system offers advantages in the reconditioning market. Specifically, as noted above, the hexagonal base or lip of applicant's plug extends over the surrounding drum head or lid. This feature permits the use of a single gasket, outside the drum, between the lip of the plug and the drum head to block any potential path for leakage. In contrast, opposer's system, the other major competing design, requires a gasket between its plug and the flange, and an internal gasket which is installed with the flange between the drum head and the flange. Consequently, when a drum is cleaned through burning in the reconditioning

process, applicant's closure system remains entirely intact.[9] The plug and the closure can simply be reinserted to achieve a secure seal. On the other hand, when a drum with opposer's closure system is cleaned by burning, the internal gasket is destroyed. As a result, some workaround or adjustment to the closure system must be employed to block and seal the potential path for leakage through the area between the drum head and flange where the internal gasket no longer functions.

With specific reference to the hexagonal shape of the lip of applicant's plug, opposer argues that this shape is the best shape to permit tightening or opening of the plug when a plug wrench is not available. As opposer states,

> Mr. Dwinell [opposer's trial witness] testified that the hexagonal shape is more functional than any other shape that might be used to turn the head with a pipe wrench or monkey wrench. First and foremost, the hexagonal shape is one that readily suggests functionality to a user that the plug may be turned with a wrench, just as common nuts and bolts may be. (Exh. U at 43-44) A round shape would not be suitable because a wrench could not readily grasp onto the plug given that there are no flat sides. (*Id.* at 44-45) A square shape would have the disadvantage of requiring increased material as well as not readily suggesting that the plug could be turned with a wrench. (*Id.* 46-47).

---

[9] Applicant attempts to minimize both reconditioning and the current use of burning as a method for cleaning in the reconditioning process. Applicant cannot deny, and the record shows, that reconditioning occurs and that reconditioners sometimes use burning to clean the drum during that process. See, for example, the testimony of Edward C. West, Jr. at 48-50.

Opposer also notes that applicant made of record a copy of third-party U.S. Patent No. 4,135,639 showing a plug with a head having a generally round exterior with two opposing flat sides which can be gripped by a wrench. Opposer states, "Mr. Dwinell, however, testified that this arrangement would not be suitable for manufacturing purposes, because one needs to have opposing flats at every location along the perimeter so that they may be properly fed along a chute." There is no evidence of record that anyone ever produced such a design suggesting that this design is not a viable alternative to applicant's design. Consequently, we accord this evidence little probative weight.

Opposer argues at some length that certain "specifications," which are of record, have referred to applicant's design:

> It is not surprising that other companies seeking to sell steel drum closures functioning in the same manner as Applicant's would use a hexagonal periphery for the head of the plug, because a federal Purchasing Specification that was effective from the late 1950s until 1994 required *a hexagonal head* for this type closure. This specification, No. PPP-P-420 (versions A and B), has been entered into evidence several times in these proceedings including as Exhibits U-8 (version A) and U-9 (version B). Both versions contain the following requirement: "The two inch plug shall have a hexagonal-shaped head with a minimum of 2 7/8 inches across the flats, and these flats shall have rounded corners." (Exh. U-8 at ¶ 3.3.3.3.) (Emphasis in the original.)

27

Opposer also argues that evidence that others employed applicant's design shows its functional advantages. Opposer asserts, through the testimony of Davis B. Dwinell and otherwise, that those others include the Allen-Stevens Company which opposer asserts sold plugs of the same design as applicant from "the late 1960s through the early 1990s." Opposer also argues that Contech sold the product from "the mid 80s until the mid-to-late 1990s."

Applicant also offers numerous arguments which more or less relate to the alternative-design factor.

Applicant argues that plug wrenches, applied to the plug insert, are used to tighten and remove plugs, rather than other types of wrenches which might be applied to its hexagonal base. Applicant argues further that commonly available standard wrenches are not large enough to grip the base of its plug. Applicant argues too that hand tightening is not used when the plug must be fully tightened.[10] Applicant also argues that, "If one wanted to make a plug head to be turned by a commonly available wrench, a hexagonal shape would not be required. Multiple other shapes could accomplish the same purpose." Applicant states

---

[10] On this point, in particular, and elsewhere in its brief applicant recounts in detail the evidence and argument it presented to the examining attorney during the ex parte examination and suggests that we should simply adopt the same conclusions as the examining attorney. Such an approach would defeat the purpose of the opposition proceeding. We must base our conclusions on the entire record and arguments presented in this inter partes proceeding. See footnote 12 below also.

further, "A design engineer at Applicant has stated that a plug with any shape, even a plug with twenty, thirty or forty sides, could be made and could achieve the same function as Applicant's plugs.  Ex. J at 88-89."

Applicant also argues that the current thickness of its plug head is such that it would be difficult to grip with a standard wrench and that attempting to do so could cause injury, as a result of the wrench losing its grip while in use.

In addition, applicant argues that use by others of its plug design may result in "torque confusion."  That is, applicant asserts that a certain level of torque is required to tighten its plug into a flange, and a different level of torque is required for opposer's plug and others, and that users may be confused and apply the wrong torque if someone sells a plug resembling its plug but requiring a different torque level.

Applicant also disputes the relevance of the specifications to which opposer refers, indicating that they have not been in effect for ten years and that they did not apply to most sales.

Applicant also argues that opposer could simply redesign its flange to overcome any disadvantage resulting from the destruction of its gasket during reconditioning, and that opposer and others have actually used a replacement

plug which does not incorporate applicant's mark to remedy the potential flange leakage problem after cleaning by burning during reconditioning.[11]

First with respect to the advantage applicant allegedly enjoys as a result of its design in the reconditioning market, we agree with applicant. That is, while applicant may enjoy an advantage, it is not the specific features applicant claims as its mark here which result in that advantage. It is the extended lip, not the hexagonal shape of that lip, which is key to this advantage. Indeed, an extended lip which is not hexagonal would serve equally well in compressing the gasket against the drum head and blocking any leakage paths. For example, a simple round shape would serve this purpose.

With regard to arguments related to the advantage the hexagonal shape affords in providing an alternative means to tighten or open the plug, we agree with opposer. We find applicant's arguments that there are numerous alternatives unpersuasive. While the record does establish that a specialized plug wrench or pneumatic tool applied to the plug insert would be the best and most common method to

---

[11] Applicant also argues at some length regarding certain trademark registrations opposer once owned for particular features of opposer's closure system. None of those registrations is currently active. Furthermore, none of the features is in any way relevant to the features applicant now claims in its applications. Accordingly, we find opposer's prior registrations not relevant to the issues before us here.

tighten a plug fully, we conclude that applicant's hexagonal
base provides an alternative.  The hexagonal base can be
gripped by at least some standard wrenches or by hand.  This
advantage is most apparent when applicant's design is
compared to opposer's design where it is practically
impossible to grip the outside of opposer's plug with a tool
or by hand either to tighten it fully or to open it.

We also conclude that the hexagonal shape is in many
ways optimal for this purpose.  As opposer asserts, nuts and
bolts, which are turned by wrenches, are hexagonal.  In
fact, this Board has previously considered and confirmed the
functional advantages of the hexagonal shape of a product to
permit tightening with a wrench when a wrench was not the
recommended or preferred method for tightening.  In re
Pingel Enterprise Inc., 46 USPQ2d 1811, 1819-20 (TTAB 1998).

While a pipe wrench may be used to turn a round shape,
such a shape would present more difficulty and would limit
the types of wrenches which could be employed.  Although
applicant has presented catalogs containing examples of
standard wrenches which are not wide enough to grip its
hexagonal head, we cannot conclude that no such wrench
exists, particularly in view of other evidence, such as
applicant's own touting of this feature.  In re Caterpillar,
Inc., 43 USPQ2d at 1341.  We reject applicant's suggestion
that its statements refer to hand tightening and not the

31

potential use of standard wrenches. We likewise reject applicant's suggestion that the number of sides could be greatly expanded, even up to forty. The record and simple logic tell us that the greater the number of sides the lesser the advantage gained for purposes of gripping the exterior.

Even if purchasers and users of closure systems, such as those at issue here, may not often take advantage of the hexagonal shape to tighten or open a plug, it nonetheless provides a functional advantage. Pingel Enterprise Inc., 46 USPQ2d at 1819-20.

In this regard we note that the witnesses in this case included drum makers and drum fillers, but not the ultimate customers of the drum fillers who are users of the drums. This group may, in fact, have a greater need for the advantage offered by the hexagonal head because they may more often find themselves without a plug wrench to open or close a drum which has been delivered to them. As Frederick W. Honerkamp III, who worked with a drum filler, notes, "They [customers] would open it with bananas if they could."

With regard to applicant's arguments concerning the thickness of the metal in the base of applicant's plug, applicant also indicates that it once used thicker gauge

32

steel than it now uses.[12]  We presume applicant could use thicker steel again.  Furthermore, because applicant's mark is not limited to any thickness specification, we must reject this argument.  Even if applicant does not use thicker gauge steel, competitors may adopt applicant's hexagonal design and employ thicker gauge steel.  Any registrations resulting from these applications could theoretically preclude them from doing so.

With regard to the "torque" argument, we find applicant's position unpersuasive.  The record establishes that the ordering, delivery and use of steel drums is a process that occurs in a setting where there is sufficient technical knowledge and support to ensure that drum users will not be confused as to the proper torque required for the closure system in use.

With regard to the defunct government specifications, while they no longer apply, they are consistent with an established pattern of customer preferences.  The record indicates that the two designs used by applicant and opposer have dominated the industry for many decades, both before and after the government specifications applied.  There is no evidence that any other design has held a significant

---

[12] We find the evidence that the thickness of the steel may result in injury as a result of use of a wrench less than overwhelming. On balance it seems that one working with care and skill could use a standard wrench safely in a case where it was necessary.

market share in recent decades. That is, customers appear to have a preference for these two systems; and this preference is reinforced by the nature of the product. Because the product requires specialized equipment and training to install and to use, there is a natural resistance to change to a new design. While this has no direct relevance to the hexagonal shape, the hexagonal shape is an integral part of one of the two dominant systems and it may play a role, based on an incremental functional advantage, in dictating the choice of applicant's system. Applicant's and opposer's designs each offer a set of advantages and disadvantages with regard to a number of properties, such as, drainability, suitability for reconditioning, and ease of tightening and opening the plug. The set of advantages for each has become linked with the respective system over time and reinforced through the government specifications. In order to compete fully, a manufacturer would prefer to be able to offer either system to meet the preferences and specific needs of customers.

Accordingly, with regard to the use of applicant's overall design by others, as reflected in the government specifications, we conclude that this likewise indirectly supports the proposition that applicant's overall design, including the hexagonal base, is functional.

34

Applicant disputes the relevance of any use by Allen-Stevens, arguing:

> Opposer asserts that Allen-Stevens sold plugs incorporating the configuration of the Subject Marks from the late 1960s through the early 1990s. Opposer's Brief at 12. To support this assertion opposer relies on a 1977 International Trade Commission Report, the testimony of Opposer's Product Manager and the testimony of a former employee of Allen-Stevens, James St. Germaine; a United States Patent issued in 1978 under Patent No. 4,124,140, identifying Allen-Stevens as the assignee; and Allen-Stevens catalog pages. Opposer's Brief at 12-14.
>
> Applicant acknowledges Allen-Stevens sold plugs incorporating the configurations of the Subject Marks for several years, but this was done with Applicant's authorization and control.

Applicant relies nearly entirely on the testimony of Gary Monroe Baughman, its employee, to establish that Allen-Stevens' sale of plugs incorporating applicant's mark was subject to applicant's control. As opposer notes, Mr. Baughman's knowledge of the relevant facts was limited and secondhand. Conspicuous by its absence is any document showing that applicant in any way authorized the use by Allen-Stevens or controlled its use, or any witness who could testify from personal knowledge as to the authorization and control.

The overwhelming weight of the evidence indicates that Allen-Stevens manufactured and sold the products in its own right. Most importantly, the testimony of James St. Germaine, an Allen-Stevens employee at the time, indicates

that Allen-Stevens produced and sold the goods without any authorization from applicant. Furthermore, all of the documentary evidence, for example, the Allen-Stevens patent and catalogs, are consistent with this testimony. There is no mention of applicant in any of these materials, nor is there any evidence that applicant's RIEKE house mark appeared on any of these products. Also, in the case of a product-design mark, such as the mark at issue here, even the authorized use of such a mark by others, such as under a private label, may impair applicant's claim to rights in the mark. See British Seagull Ltd. v. Brunswick Corp., 28 USPQ2d 1197, 1203-04 (TTAB 1993), aff'd, 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994), cert. denied, 514 U.S. 1050 (1995).

Regarding Contech, the other third-party user of the hexagonal base referenced by opposer, applicant does not dispute this use but states, "Applicant took a variety of measures to stop Contech from selling hex-head plugs and eventually bought the tooling for the hex-head plugs from Technocraft [the manufacturer for Contech] sometime prior to 1998." In this regard applicant also refers to other companies, not mentioned by opposer in its argument, which had sold plugs with a hexagonal base and notes that they ceased use as a result of applicant's actions. We will address those uses below.

In sum, based on all relevant evidence of record we conclude that there are no significant alternative functionally equivalent designs to applicant's hexagonal base or lip. Applicant's hexagonal base possesses unique functional advantages. This factor strongly favors opposer.

*Simpler or Cheaper Method of Manufacture* – There does not appear to be any serious factual dispute regarding this factor. The lip extending out from applicant's plug with its hexagonal shape requires more metal, and consequently, is more costly to manufacture than other designs, such as opposer's design for its competing product. The increased cost appears to be quite minimal, however. Accordingly, applicant's hexagonal base is not cheaper or easier to manufacture. If the evidence related to other factors, on balance, indicates that the hexagonal base is functional, the functional advantages may very well outweigh the rather minor increase in cost. See Pingel Enterprise Inc., 46 USPQ2d at 1821 (TTAB 1998); In re American National Can Co., 41 USPQ2d 1841, 1844-45 (TTAB 1997). Therefore, we conclude that this factor is neutral.

Accordingly, based on the totality of the evidence bearing on the Morton-Norwich factors, we conclude that applicant's hexagonal base or lip for its plug is functional. We conclude so based principally on the Allen-Stevens patent, applicant's touting of the functional

37

advantages and the limited availability of functionally equivalent alternatives. Opposer has made a prima facie showing that applicant's hexagonal base is functional, and applicant has failed to rebut opposer's showing.

The Butterfly-Shaped Grip

We will also analyze opposer's and applicant's arguments and evidence related to each of the Morton-Norwich factors with respect to the butterfly-shaped grip.

*Expired Patents* – Opposer once again points to expired U.S. Patent No. 4,124,140 in support of its position that the butterfly-shaped grip is functional. Opposer states, "The patent further references a 'transverse' handle that is shown as being in the same butterfly shape as Applicant's Subject Marks." The patent states, "a transverse raised handle may be provided on the cap so that the cap is manually rotatable." Opposer also points to claim 13 of the patent which states, "the closure of claim 1 in which a transverse raised handle is provided on the cap so that the cap is manually rotatable."

Applicant argues, "the specification of the patent does not even address the butterfly shape of the grip. The specification merely states a 'transverse (i.e., lines at right angles) handle 42 is provided above section 40 so that the cap 34 may be manually rotated about its central axis.'"

38

Applicant also makes the same general arguments here as it raised with regard to the patent and the hexagonal base. Specifically, applicant argues that the patent is directed to a "Gasketed Flange Sealer" and not the grip and that the grip had been in use long prior to the filing of the patent application.

Here too we note that, even though the grip may not have been the primary object of the patent, the patent language points to the functional advantages of a "transverse raised handle" to rotate the cap or plug. However, the butterfly shape is not identified in the language of the patent.

In this instance, we conclude that the patent provides evidence only that a transverse handle or grip is functional, but no evidence as to a butterfly-shaped grip. The patent evidence as to this feature is not supportive of opposer's position.

*Advertising Materials* – The only evidence opposer points to of applicant's touting the functional advantages of the butterfly-shaped grip is the following: "Mr. Delaney [third-party witness] testified that Rieke representatives calling on him in his role as a Rieke customer had also touted the advantages of the butterfly-shaped grip." Accordingly, we conclude that the evidence of any touting of

39

the functional advantages of the butterfly-shaped grip is minimal.

*Alternative Designs* – Opposer makes many of the same arguments with respect to alternative designs for the butterfly-shaped grip as it makes regarding the hexagonal base. First opposer points to statements by third-party witness David Delaney indicating that the grip was easy to grasp when hand-tightening a plug, particularly when wearing gloves. Opposer notes, as it did with regard to the hexagonal base, that others, such as Allen-Stevens and Contech, have used the butterfly-shaped grip. Although the now-defunct federal regulations discussed above picture the butterfly-shaped grip, as opposer notes, opposer does not refer to, nor do we find, any specific mention of the grip design in the regulations. Opposer concludes its argument with regard to alternative designs for the grip as follows: "It is readily evident that a transverse rectilinear 'bar'- type shape, as claimed in the '140 Patent, is the optimal design for an insert within the plug to allow the insert to be grasped and tightened by hand. . . . Whether or not the butterfly is the superior design, it is certainly one of only a few, and it is therefore de jure functional."

On the other hand, applicant argues that there are numerous alternative designs for the insert for the plug which would serve equally well for hand tightening of the

plug, and to engage a plug wrench. Applicant argues further that its four-pronged wrench would work to engage not only its butterfly-shaped grip but grips of other designs. Applicant refers to its testimony, "Applicant's Senior Manufacturing Engineer has seen twenty to fifty different shapes of inserts used for closure plugs." Applicant claims further that opposer's insert is superior in holding a wrench and cites testimony confirming this observation from opposer's own witness, Mr. Dwinell.

We find applicant's position persuasive with regard to this factor. First, we note that there is no patent which specifically covers the butterfly shape. For the purpose of both turning a plug by hand or engaging a wrench or pneumatic tool to tighten the plug fully, there are numerous alternative designs which would work equally well, including other transverse linear bars or other types of inserts, such as the insert opposer employs. With specific reference to turning by hand, which is most important here, other transverse linear bars would likewise permit a gloved hand to grip the insert equally well. Indeed, an examination of opposer's own plug demonstrates that its insert with the folded loops opposite one another in the cup also provides space for gloved fingers and opposing surfaces to facilitate turning. Accordingly, we conclude that this factor favors applicant.

*Simpler or Cheaper Method of Manufacture* – As noted above with regard to the hexagonal base, there does not appear to be any serious factual dispute regarding this factor as to the butterfly-shaped grip either. There is no evidence that the butterfly-shaped grip is either cheaper or more efficient to manufacture. Therefore, we conclude that this factor is neutral.

Accordingly, based on the totality of the evidence bearing on the Morton-Norwich factors, we conclude that applicant's butterfly-shaped insert or grip for its plug is not functional. We conclude so principally because this specific shape is not disclosed by a utility patent, because there is no significant evidence of "touting," and because there are a significant number of functionally equivalent alternative designs for this feature. Opposer has failed to present a prima facie case that the butterfly-shaped grip is functional.

Finally, based on our conclusion that applicant's hexagonal base or lip for its plug is functional, we conclude that applicant's mark in both applications is functional overall. The hexagonal base is one of the two key features applicant includes in its mark in both applications. In either of its applications applicant could have claimed only the hexagonal base or only the butterfly-shaped grip as the mark. For example, applicant could have

claimed only the butterfly-shaped grip in one application by depicting the hexagonal base in dotted lines and by describing the mark as including only the butterfly-shaped grip. Applicant did not do so. Even if applicant had done so, applicant's failure to show acquired distinctiveness, as explained below, would still bar registration in both applications.

### Acquired Distinctiveness

In view of our conclusion that applicant's mark is functional, applicant's mark is unregistrable whether or not applicant has shown that its mark has acquired distinctiveness. In re Caterpillar, Inc., 43 USPQ2d at 1342. Nonetheless, in the event applicant ultimately prevails in any appeal from this decision, we will consider whether applicant has shown that its mark has acquired distinctiveness. To register a product design as a mark an applicant must show that the mark has acquired distinctiveness; such marks are not inherently distinctive. Wal-Mart Stores, Inc. v. Samara Bros., Inc., 54 USPQ2d at 1055 et. seq.; Qualitex, 34 USPQ2d 1161 at 1163. Applicant does not dispute that it must show that its mark has become distinctiveness, but rather, applicant asserted that its mark has acquired distinctiveness.

In an opposition proceeding, opposer has the initial burden to present prima facie evidence or argument upon

which we could reasonably conclude that applicant's mark has not acquired distinctiveness. <u>Yamaha Intl. Corp. v. Hoshino Gakki Co. Ltd.</u>, 840 F.2d 1572, 6 USPQ2d 1001, 1004-1008 (Fed. Cir. 1988). If opposer does so, the burden of proof shifts to applicant to prove by at least a preponderance of the evidence that the mark has acquired distinctiveness. <u>Id.</u>

Applicant relies principally upon the following to establish that its mark has acquired distinctiveness: sales volume, advertising expenditures, long use, declarations indicating recognition of the mark, and a survey.[13]

Opposer argues that applicant's use has not been exclusive, that "canned" declarations are of little value, and that applicant's survey actually supports opposer's contention that applicant's mark has not acquired distinctiveness.

First, with regard to the sales and advertising, the sales level and advertising expenditures for applicant's product appear to be substantial for the types of products at issue here. Applicant's position as second in market share confirms that its sales are significant. Applicant's

---

[13] Applicant submitted affidavits and other evidence during the ex parte examination of the applications. Although the application files for the opposed applications become a part of the record in these proceedings, the evidence submitted during ex parte examination is not; we can only consider evidence which has been properly made of record in this proceeding. <u>Kellogg Co. v. Pack'em Enterprises Inc.</u>, 14 USPQ2d 1545 (TTAB 1990), <u>aff'd</u>, 951 F.2d 330, 21 USPQ2d 1142 (Fed. Cir. 1992).

advertising expenditures likewise appear to be significant for the type of product. But, it is not clear to what extent, if any, the advertising was directed to the specific product and mark at issue here. More importantly, high sales alone are of little probative value in a case such as this; high sales do not necessarily translate into recognition of a product-design mark. Braun Inc. v. Dynamics Corp. of America, 975 F.2d 815, 24 USPQ2d 1121, 1133 (Fed. Cir. 1992); Pingel Enterprise Inc., 46 USPQ2d at 1822.

Furthermore, applicant has neither alleged nor shown through evidence that applicant has promoted applicant's mark, either the hexagonal base or the butterfly-shaped grip, as a mark in its advertising or otherwise. In fact, the only record evidence of advertising directed to a feature of applicant's mark touts the functional advantages of the hexagonal base, not its trademark significance. In re Caterpillar Inc., 43 USPQ2d at 1341. In the absence of any evidence that applicant promoted either its hexagonal base or butterfly-shaped grip as a source indicator for the product, both the sales and advertising evidence have little probative value with regard to acquired distinctiveness. Id.

Next, with respect to the applicant's allegation of long use, although applicant asserts first use in 1940, it

45

claims substantially exclusive use only for the past ten years. Even within the ten years applicant claims, it acknowledges that other allegedly infringing uses occurred. For example, through the testimony of Mr. Baughman applicant refers to its policing efforts with regard to Rahil "within the last four years" as well as other recent sales all involving "Rieke-style" plugs. Mr. Baughman also indicates that applicant may not have purchased the tooling from Contech, one of the more significant producers of such plugs, until 1998. Presumably Contech's use of applicant's design could have continued to that point.

Although the Trademark Act permits an applicant to rely on a claim of "substantially exclusive and continuous use for at least five years" under Trademark Act § 2(f), 15 U.S.C. 1052(f), the Patent and Trademark Office has the discretion to decline to accept that prima facie showing in appropriate types of applications. In re Garcia, 175 USPQ 732 (TTAB 1972). In fact, a mere statement of at least five years use is not generally accepted in applications to register trade dress; applicants face a heavy burden in such cases. See In re Ennco Display Systems Inc., 56 USPQ2d 1279, 1284 (TTAB 2000) and cases cited therein. Furthermore, in this instance, applicant claims exclusive use only for the past ten years, a short period relative to the nearly sixty years of use it claims in these

46

applications.  All else being equal, even ten years of substantially exclusive use may not be sufficient to show that a mark has acquired distinctiveness.  Id. at 1286.  The existence of uses by others prior to, and possibly during, the ten-year period further diminishes the evidentiary value of the long-use claim.

The record here indicates that others have used applicant's mark for significant periods, including Allen-Stevens for approximately twenty years.  This fact further contradicts applicant's claim that its long use establishes that its mark has acquired distinctiveness.

With regard to the consumer affidavits, we noted earlier that affidavits submitted during the prosecution of an application are not of record in a proceeding unless properly introduced.  In this case, the record in these proceedings does include testimony from certain of those affiants, namely, Mr. Bradley Strawser, Mr. Delaney, Mr. Honerkamp, and Mr. West.  In each of the depositions the witness authenticated the affidavit which he had provided and which applicant had filed during the prosecution of the 343 application.

Each of the affidavits follows the same form with minor variations not relevant here.  Each of the witnesses attests to his experience with and knowledge of closure systems for steel drums and concludes with the following two paragraphs:

4. When a customer specifies Rieke [applicant] closures on a drum, my company ensures that we have installed Rieke closures by quickly looking at the shape of the closure. The Rieke closures are distinct from other closures used by other manufacturers in that the Rieke closure is hexagonal in shape and has a distinctive handle at the center of the closure. The handle is shaped like a "dog bone" or butterfly.

5. At least for the past 10 years, Rieke has been the only company selling closures having this distinctive configuration. Therefore, it has become widely accepted in the closure and drum industry that closures having this hexagonal outline and the "dog-bone" grip are Rieke closures.

The testimony of these witnesses is somewhat ambiguous as to whether they truly viewed either the hexagonal base or the butterfly grip as a source indicator for applicant's product. Mr. West and Mr. Strawser testified that they only bought hex head plugs from applicant and that applicant's plugs had RIEKE printed on the butterfly grip. With respect to uses by third parties, Mr. Delaney referred to a "Rieke-type" plug and indicated a general awareness of generics, that is, products of other manufacturers employing the same design as applicant. Under the circumstances, we conclude that the affidavits and testimony of these witnesses is of limited probative value on the question of acquired distinctiveness.

Lastly, applicant's expert witness, Mark Traylor of National Market Measures, performed a survey which is of record. In the absence of any challenge from opposer, we accept Mr. Traylor's qualifications as a survey expert. The

48

survey report indicates that, "The purpose of this survey was to learn the extent to which the following 55 gallon drum closure is associated with Rieke."  The report then shows a photo with an overhead view of the Rieke plug with the RIEKE word mark removed.  The report indicates further, "The population was defined as persons who are involved in ordering, buying, evaluating, or creating specifications for 55 gallon steel drums in the United States."  The target population for the survey included drum manufacturers, drum reconditioners and drum fillers in the United States.  The survey company contacted individuals from companies in these categories by telephone to identify individuals qualified to take part in the survey.  A total of 208 individuals contacted were found qualified; 128 individuals ultimately took part in the survey.

The participants viewed and responded to the main questionnaire at an Internet web page set up by the survey company.  The survey asked three principal questions. First, respondents viewed two photos with overhead views of applicant's plug, both with the RIEKE word mark removed, one free standing and one screwed into a flange and drum lid. Respondents were asked in Question 1, "To the best of your knowledge, how many different companies make a metal closure fitting shaped like the one you see?"  Nineteen percent of

49

respondents indicated one company; 23% indicated two companies. None of the remaining responses exceeded 10%.

Then respondents were taken to another page for Question 2. Those who had indicated one company in response to Question 1 went to a page corresponding to that response; those who had indicated two companies went to another page, and so on. Question 2 asked: "Which company makes the metal closure fittings for 55 gallon drums shaped like the one you see?" Here the report aggregates the responses. Most importantly, the report does not specify what the 19% of respondents who had indicated "one company" in response to Question 1 said in response to Question 2. Instead the report includes a chart entitled "(first name mentioned)" showing that a total of 38% of all respondents mentioned RIEKE first in response to Question 2 in all of its variations.

All respondents were then asked Question 3: "Which one of these manufacturers, if any, do you most associate with the closure? Even if you have already named this company, please mark it again." Then respondents were shown a randomized list of 12 companies, including Rieke, American Flange, and others, from which to select. Respondents were also offered the choice of specifying a company not listed or indicating that the respondent did not associate any

company most with the closure fitting.  In response to this aided question 63% indicated Rieke.[14]

In its brief applicant acknowledges that consumer surveys are one of the few forms of direct evidence of acquired distinctiveness, citing Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 59 USPQ2d 1720, 1730 (1st Cir. 2001) and other cases.  As such the survey is a key piece of evidence.  However, applicant only mentioned selected results from the survey in its brief.  For example, applicant makes no mention of Question 1 and states:

> In an unaided response to a question [Question 2] asking respondents to name the company or companies that make the closure plugs incorporating the Subject Marks, 38% of respondents, the most of any company named, identified Applicant first as the manufacturer of the closure plugs.  Ex. BB-9 at 4.  The survey Expert explained that in a question such as this, the first answer given is "often interpreted as the response respondents most associated with the question."

In its reply brief, opposer takes issue with applicant's use of the survey, stating, "Applicant points to a survey that it commissioned as evidence that its Marks have secondary meaning.  To the contrary, the results of the survey, as reported by Applicant's expert Mark Traylor (but not as discussed by Applicant) establish definitively that Applicant's Marks *do not serve* as an indicator of

---

[14] Our summary of the report is abbreviated.

source. . . . It is not necessary that consumers associate the mark correctly with Applicant, but a significant portion of them must believe that the mark comes from just one source, even if they are not aware as to who that source is." (Emphasis by opposer.) Opposer then adds, "He ended up with a sample size of 128. Of those 128 respondents, only 24, or 19 *percent*, believed that the hex head plug was made by just one company."

The survey here is highly similar in many important respects to the survey the Board discussed in British Seagull Ltd. v. Brunswick Corp., 28 USPQ2d at 1201-3. The Board described that survey, in relevant part, as follows, "Interviewees were shown a photo of a Mercury outboard engine, but the photo had been touched up to remove the striping and the trademark 'MERCURY,' leaving the engine entirely black. Interviewees were asked whether they associated the color of the engine with one particular company or with more than one company. Those who responded that they associated the color with one particular company were then asked who they believed manufactured the engine." Id.

In British Seagull the Board concluded,

> The problem we have with the survey is that while the survey does establish that a large portion of interviewees are aware that applicant makes black outboard marine engines, the survey does not provide convincing proof that these people believe that all

52

> black engines come from the same source.  The interviewees in the survey were presumably not well versed in the legal significance trademark lawyers would attach to the phrase "associate with one particular source."  We think it likely that when these consumers responded affirmatively that they associated the color black with one particular company, what they were communicating was that they could recall only one company that made black engines, rather than that they were able to name more than one such company. . . . [T]he affirmative responses would at best support the conclusion that a majority of those surveyed knew that applicant makes black engines.  That interviewees could recall that applicant makes black engines is not surprising in light of applicant's sales and advertising, its market share and the length of time that it has sold black engines.

Id.

Applicant's survey here has some of the same and perhaps even more serious defects.  Furthermore, even apart from the design defects, the reported results which are most defensible, in fact, show that applicant's mark has *not* acquired distinctiveness, as opposer alleges.

The statement of the purpose and the conclusion in applicant's survey report exhibits a conceptual flaw which permeates the survey.  To show acquired distinctiveness, it is not sufficient to show that the applicant is the party "most commonly associated with" the product design.  Rather, the applicant must show that the product design identifies a single source, that is, that the public has come to expect that every plug having the appearance of applicant's plug to be from applicant, even though it does not bear the RIEKE

mark.  Petersen Mfg. Co. v. Central Purchasing, Inc., 222 USPQ at 568.

In this regard, applicant's first question is most relevant, though imperfect, as the Board noted in British Seagull.  A question asking "how many different companies make" a product of a particular design does not begin to address whether relevant consumers view the product design as a source indicator.  Nonetheless, the fact that only 19% think only one company makes products employing this product design contradicts applicant's claim that applicant's mark has acquired distinctiveness.  Although the Board did not provide the precise results from the survey in British Seagull, it is apparent that a majority of respondents indicated that there was one source.  Here, 19% is far short of the level necessary to show applicant's mark has acquired distinctiveness, even if the result was otherwise reliable. In re Owens-Corning Fiberglas Corp., 774 F.2d 1116, 227 USPQ 417, 424 (Fed. Cir. 1985)(surveys showing 41% and 50% recognition, submitted together, found sufficient to establish acquired distinctiveness for trade dress); In re Jockey Intl., Inc., 192 USPQ 579, 581 (TTAB 1976)(survey showing 51.6% recognition found sufficient to establish acquired distinctiveness for trade dress).

In the case of applicant's survey, we do not even know whether the low 19% figure reflects the true results from

Question 1 & 2. To evaluate the results we would need to know how many respondents among the 19% who initially indicated that only one company made a plug with the appearance of applicant's plug indicated the name of some company other than Rieke in responding to Question 2. Those results would have to be deducted from the 19%. Furthermore, applicant's survey design did not include a control or comparison to evaluate "noise." Cf. Ava Enterprises Inc. v. Audio Boss USA Inc., 77 USPQ2d 1783, 1787 (TTAB 2006). For example, another group of respondents could have been shown a plug design not offered by applicant to determine the extent to which respondents might name applicant regardless of the appearance of the plug. This noise would also be deducted from the already low 19% result.

The aggregated results from Question 2, in any event, tell us nothing useful. The only results which would have been relevant here are the responses from those respondents who indicated that only one company made the plug they were shown. The results from Question 2 from those respondents who indicated in Question 1 that more than one company made the plug are not relevant. The fact that respondents may have listed applicant first among many companies they believed made the plugs is not meaningful for the purpose of showing acquired distinctiveness.

55

Nor are the results from Question 3 relevant to the question at hand. The question itself is defective because it asks respondents to indicate the company they "most associate" with the plug they were shown. The question does not address acquired distinctiveness. Like the survey in British Seagull, the only information these responses are likely to provide is a measure of the general awareness of applicant's product, not any information as to whether respondents view the appearance as indicating a single source. Also, the fact that respondents were aided in this question by being presented with a list of companies, including applicant, taints the results still further. Cf. In re Jockey Intl., Inc., 192 USPQ at 581.

Accordingly, we conclude that applicant's survey is not probative of acquired distinctiveness, and furthermore that the results indicate the absence of acquired distinctiveness, if they indicate anything at all.

Finally, after considering all of the evidence, we conclude that opposer has made a prima facie case that applicant's evidence of acquired distinctiveness is inadequate and that applicant has failed to establish that its mark has acquired distinctiveness by a preponderance of the evidence.

Fraud

As indicated above, opposer also claims that applicant committed fraud in securing the examining attorney's approval of the applications. For completeness, we will address this claim also.

In its notices of opposition opposer does not point to the specific "misrepresentations" or "omissions of fact" in its fraud claim but generally refers back to several earlier paragraphs of the notices stating that "one or more of these material facts were misrepresented or omitted with the intent to deceive the Trademark Office into approving the Proposed Mark for publication." The referenced paragraphs in the notices cover a wide range of subjects.

In its brief, opposer states the following with regard to its fraud claim, which applicant disputes: ". . . Applicant presented evidence selectively in an effort to mislead the Trademark Office into allowing the Subject Marks to be published. This included the failure to provide either the Federal or European specifications, and the misleading presentation of customer declarations, which omitted any mention of references to competitors, such as Allen-Stevens and Con. Tech. (sic) Applicant should not be permitted to profit from such actions."

Due to its failure to identify the specific statements it alleges to be fraudulent in its notices of opposition, we

57

dismiss opposer's fraud claims for failure to allege fraud with sufficient particularity.  Nonetheless, for completeness, we will address the fraud claims on the merits in the event opposer's statements either in its notices of opposition or in its brief could be considered sufficient to state a claim.

Preliminarily, both opposer and applicant refer to "inequitable conduct" rather than fraud in their briefs in discussing this claim.  This suggests that both parties may be equating fraud in the procurement of a trademark registration with a breach of the duty to disclose in patent matters.  The two are very different in concept and application.  See generally J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §§ 31:62-31:64 (4th Ed. 2006).  In the patent context, the term "fraud on the Patent Office" has been supplanted by "inequitable conduct."  Id. The change in terminology recognizes that the patent concept differs from fraud in the law more generally.  In the patent context the applicant or its attorney has "an almost fiduciary-like duty of full disclosure."  Id.

The concept of "fraud" in the trademark registration context is more akin to fraud in other fields of law.  For purposes of the Trademark Act, an applicant commits fraud by knowingly making a false statement as to a material fact in conjunction with a trademark application.  Mister Leonard

58

Inc. v. Jacques Leonard Couture Inc., 23 USPQ2d 1064, 1065 (TTAB 1992).  Thus the statement in question:  (1) must be false; (2) must be made with knowledge that it is false; and (3) must be material to the examining attorney's decision to approve the application.

The standard of proof for a fraud claim is the rigorous clear-and-convincing-evidence standard, and it is strictly applied.  Standard Knitting Ltd. v. Toyota Jidosha Kabushiki Kaisha, 77 USPQ2d 1917, 1926 (TTAB 2006); Smith International Inc. v. Olin Corp., 209 USPQ 1033, 1044 (TTAB 1981)("It thus appears that the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence.  There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.").

In similar cases where the Board has found fraud it is generally crystal clear that the statement in question is false.  Usually the applicant or registrant effectively admits that the statement is false, or the record otherwise clearly establishes that the relevant statement is false. See, e.g., Torres v. Cantine Torresella S.r.L., 808 F.2d 46, 1 USPQ2d 1483, 1484-85 (Fed. Cir. 1986); Medinol Ltd. v. Neuro Vasx Inc., 67 USPQ2d 1205, 1209 (TTAB 2003); First International Services Corp. v. Chuckles Inc., 5 USPQ2d 1628, 1636 (TTAB 1988).

Here we do not have that kind of clarity. On the contrary, we have genuine ambiguity. First with regard to applicant's alleged failure to provide the specifications, as applicant notes, the European specifications are not relevant here. It is also questionable, as applicant argues, as to whether the defunct U.S. specifications were within the scope of the Examining Attorney's request or otherwise relevant. As to the consumer statements and the failure to mention Allen-Stevens or Contech, applicant has argued at length as to why those uses should not be considered. Although we have generally rejected those arguments, we believe applicant presented the arguments in good faith. Thus, we find insufficient evidence that applicant had the intent required to establish fraud. In the absence of clear and convincing evidence that applicant acted in bad faith, we conclude, on this record, that applicant did not commit fraud.

Finally, in reaching our conclusions in this case we have carefully considered all of the evidence of record, as well as all of the parties' arguments with respect to the issues in this case, including any evidence and arguments not specifically discussed in this opinion.

**Decision**: The oppositions with regard to both applications are sustained both on the ground that applicant's mark is functional and on the ground that

60

applicant has not shown that applicant's mark has acquired distinctiveness.  The claims with regard to fraud in both applications are dismissed.  Registration is refused in both applications.

Also, as explained above, within thirty days of the mailing date of this decision, the parties are ordered to resubmit a redacted copy of all testimony and exhibits submitted under seal with only those portions which truly need to be kept under seal redacted.